THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT S. DEPPERT, Defendant-Appellant.

Third District   No. 79-219

Opinion filed April 29, 1980.

STENGEL, J., dissenting.

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, for appellant.

Bruce Black, State's Attorney, of Pekin (John X. Breslin, of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE STOUDER delivered the opinion of the court:

Following the entry of judgment of conviction against the defendant, Robert S. Deppert, on two counts of the unlawful use of weapons, he was sentenced to a determinate term of imprisonment of five years on one of those counts. In the appeal from his conviction, the defendant raises the issue of whether the trial court erred by denying the defendant's motion to suppress. It is the defendant's contention that the contested evidence was the tainted fruit of a police officer's unlawful stop.

At the hearing on the motion to suppress, the defendant testified that on the evening of September 25 and 26, 1978, the defendant was at the Country Bumpkin until 2 a.m. This establishment was located in Creve Coeur at the bottom of a hill. After leaving the Country Bumpkin, the defendant drove home. Following an argument with his wife, the defendant left at 3 a.m. to return to the Country Bumpkin, which was open until 4 a.m.

The entrance to the Country Bumpkin was on Wesley Road which, in turn, intersected with Route 29. After turning onto Wesley Road, the defendant observed that the Country Bumpkin was closed. He then drove down Wesley Road and over some railroad tracks, turned around in a parking lot, and started back up Wesley Road to get back on to Route 29.

When the defendant was headed back toward Wesley Road, a police

officer stopped him. The officer asked defendant if he was having trouble, and the defendant responded that he was not. The officer did not indicate defendant was under arrest or suspected of violating any traffic laws.

The officer had the defendant get out of the car. No consent was given to search or look into defendant's car, but while defendant's hands were positioned on the trunk lid, the officer went into defendant's automobile.

On cross-examination, the defendant indicated that when the officer stopped the defendant their cars were door to door. After the defendant gave the policeman his driver's license, the officer ordered the defendant to place his hands on the dash. The defendant's hands were on the dash before he got out of his car, and the defendant did not reach toward the bottom of his seat or the floorboard.

The State called Randy L. Ragon, a police officer from the Village of Creve Coeur. He had been a police officer for three years, and he testified that on September 26, 1978, at approximately 4:45 a.m., he was on duty, alone, in uniform and in a marked squad car. Ragon was located at the intersection of Wesley Road and Route 29 in the "Pimco" lot. He had been on duty close to six hours and might have made one traffic stop. Ragon was sitting in the lot, out of sight, watching for people who might run the stop sign at the intersection.

At the time, Ragon observed the defendant's vehicle traveling north on Route 29. It was traveling at 10 to 15 miles per hour. The defendant turned left at the intersection onto Wesley Road. This was a 90-degree turn over two oncoming lanes of traffic. The officer added it would be reasonable to drive slow in making such a turn.

The defendant's car slowed down on Wesley Road and was moving at only about five to 10 miles per hour even though the speed limit was 35 miles per hour. The Country Bumpkin was on the same side of Wesley Road that defendant had turned onto. At that time the Country Bumpkin was closed.

Ragon saw the defendant's car go down the road, one-half mile or three-quarters of a mile until it went out of sight. Ragon observed the car for what seemed to be a minute, while it travelled approximately a little more than one-half to three-fourths of a mile, before he decided to follow it.

Ragon lost sight of the car as it went over a hill. Before the hill, there was a short row of old houses, and beyond the hill the neighborhood became a business district, with industries and warehouses. All the businesses were closed, with the exception of the railroad which had a skeleton crew. Officer Ragon further testified that, in the past two weeks, there had been two burglaries in that neighborhood.

Wesley Road was described as about a three-quarters of a block

straight stretch from Route 29, then having a 90-degree turn to the left. Then there was a straight-away and a small dip over to the hill. The drop after the hill was straight, and the road was asphalt until after the railroad. It then became gravel.

As the defendant went over the hill and out of sight, Ragon left the lot and followed the defendant to see if the defendant had any problems. As Ragon "topped the hill" he saw the defendant's car on a railroad lot, a very long stretch from the business part of the railroad yard. Ragon observed the defendant's car turn around about mid-way in the lot, approximately one-half block onto the property.

According to Ragon, the railroad yard was private property. It was posted with "No Trespassing" signs in more than one place. He did not know whether the defendant turned around because the defendant had seen his squad car when he topped the hill or whether the defendant turned around on his own. After the defendant turned his vehicle around, he drove out of the lot and headed north on Wesley, continuing to drive slowly and never varying his speed.

Ragon was headed south on Wesley towards the defendant's car. He activated his spotlight onto the defendant's car and signaled him to stop. The defendant did not attempt to avoid Ragon and stopped. At this point, Ragon had not observed the defendant commit any traffic offenses, and he indicated that he stopped the defendant "to see what he was doing at that time of the morning in the area." In his police report and grand jury testimony, Ragon stated that the only reason for stopping the defendant was to see if the defendant needed assistance, and he did not mention any burglaries in his report or prior testimony. He explained that he stopped the defendant to see if he was having trouble with his car or was lost or looking for someone. He further testified, in response to a question by the prosecutor, as follows:

"Q. Officer, when you shined your spotlight on the defendant's car and stopped him, is it a fair statement that you had two reasons. Number One, suspicion of him doing something wrong in a high crime area, and Number Two, to see if he needed assistance?

A. Or check to see if he was intoxicated."

Officer Ragon testified he had no reason to believe the defendant had committed a traffic offense and did not intend to issue a citation for trespassing. However, he stated he probably would have checked with the railroad detective as far as signing complaints. Nevertheless, Ragon said nothing in his police report or grand jury testimony about trespassing.

Upon stopping the defendant, their cars met door to door facing in opposite directions two feet apart. The defendant's door was just a little past his, so that they both had to look back over their left shoulders.

Ragon could not recall whether the defendant's car radio was on when he stopped the defendant, nor did he know whether it was turned off after he stopped the defendant.

Ragon asked the defendant if he was having any sort of problem, and the defendant responded "No." The officer then asked the defendant what he was doing down there, and the defendant responded he was turning around.

Ragon testified that the driveway was wider at the entrance and a complete circle turn could be made at the entrance. He further testified that the defendant was "too far down in to turn around and we've had everything from bodies dumped and everything down in that area of town." However, the officer had not seen anything to indicate that the defendant had done anything in the railroad yard. Moreover, he did not see the defendant get out of his automobile, and he did not believe that the defendant had time to get out of his automobile.

After the defendant told Ragon he was just turning around, the officer observed the defendant dip his right shoulder. Both of the defendant's hands were out of sight, and Ragon believed the defendant was trying to take something out from under the seat.

Ragon drew his revolver and advised the defendant to place his hands on the dash. When the defendant just stared at Ragon, the officer pointed his weapon through the car window and reiterated his command. The defendant still did not comply. Therefore, Ragon decided to jump out of his car. As he did, the defendant opened his door about 2 inches. Ragon indicated that he jumped out of his car because he was wearing a bullet proof vest and, if the defendant had a gun, he wanted to give him a chest shot rather than a head shot.

The officer pointed his gun directly towards the defendant's window and advised the defendant to come out. As the defendant got out and as Ragon placed the defendant against the car, he saw the handle of a gun and shells on the floorboard. A railroad detective came over and watched the defendant while Ragon further searched the vehicle. He found that the gun which was partially exposed was a .45-caliber pistol with one live round in the clip. He also found a .22-caliber pistol, fully loaded, as well as 25 to 30 live .22 shells. The defendant was then cuffed and placed under arrest.

In rebuttal, the defendant testified that he did not know he was on private property when he turned around. Defendant was not familiar with that area and drove further into the lot because he did not want to go into any ditches or get stuck.

When the defendant was first told to put his hands on the dash, he did not respond because he did not know why he had been stopped. At one point, the defendant moved his right arm to turn off his radio. The radio

was located under the dash, slightly right of center, towards the passenger side of his car.

The State then recalled Officer Ragon. He testified that the defendant's movement was straight down and not towards the middle of the dash on the passenger's side.

After both sides rested, arguments were heard. Based on the evidence and argument, the trial court denied the defendant's motion to suppress.

On February 22, 1979, the defendant waived his right to a jury trial and proceeded to trial before the bench. The testimony regarding the officer's stop of the defendant's car was substantially the same. After the trial, the defendant was found guilty, and a presentence report was prepared and filed. At the sentencing hearing, the court imposed the maximum sentence of five years. On appeal, the defendant raises two issues: (1) whether the court erred in denying defendant's motion to suppress; and (2) whether the trial judge considered improper factors in imposing sentence. We reverse.

Defendant's first issue is whether the court erred in denying the defendant's motion to suppress. Defendant contends that he was unlawfully stopped and, therefore, the evidence which resulted from that stop should be excluded from trial.

■■ The fourth and fourteenth amendments to the United States Constitution forbid unreasonable searches and seizures. It is clear that the stopping of a motor vehicle and the detaining of its occupants is a seizure. (*Delaware v. Prouse* (1979), 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391.) Therefore, for the evidence obtained from the stop to be admissible, the stop must not have been unreasonable. The Supreme Court has stated that for a stop to be reasonable, there must be "at least articulable and reasonable suspicion * * * that either the vehicle or an occupant is otherwise subject to seizure for violation of law * * *" *Delaware v. Prouse* (1979), 440 U.S. 648, 663, 59 L. Ed. 2d 660, 673, 99 S. Ct. 1391, 1401.

In Illinois, this standard has been codified as "A peace officer * * * may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense * * *." Ill. Rev. Stat. 1977, ch. 38, par. 107—14. See *People v. Lang* (1978), 66 Ill. App. 3d 920, 383 N.E.2d 782.

■■ The instant factual situation existent prior to the stop suggests no articulable facts which would cause an officer to reasonably infer that the defendant committed, was about to commit, or had committed an offense. Officer Ragon admitted that he had no reason to believe that the defendant had committed a traffic offense. Nor had he any reason to

believe that the defendant had committed any other offense. Officer Ragon merely observed the car traveling slowly and turning into a parking lot. The defendant turned around and was started back towards the road when he was stopped. Ragon's police report and grand jury testimony indicated that he stopped defendant to see if he needed any assistance. This reason alone is inadequate to stop a motorist.

In *People v. Lilly* (1976), 38 Ill. App. 3d 379, 347 N.E.2d 842, a motorist was traveling down a road, saw a car in back of him, slowed down and pulled over to the side so the car could pass. The car happened to be a police car, which turned its lights on and stopped the defendant's car. The officer got out and went over to the car to see if the defendant was having car trouble. The officer asked for the defendant's operator's license and discovered it had expired. Shining his flashlight in the car, the officer also noticed some guns. This evidence was suppressed at trial and the State appealed. The appellate court affirmed, stating that there was no probable cause or specific facts that reasonably led the officer to stop the car. Therefore, the evidence from the ensuing search was to be suppressed.

■■ The case before us is quite similar. The defendant was driving slowly, cautiously, and obeying the traffic laws. He turned into a parking lot, turned around and was headed back towards the road when he was stopped. He engaged in no furtive behavior. These actions were consistent with day-to-day legal activities. Defendant's actions merely indicated that he was lost or turning around in an unfamiliar place after realizing the Country Bumpkin was closed. Since the defendant's actions were not inconsistent with day-to-day legal activities, the stop was illegal. (*United States v. Shipp* (5th Cir. 1978), 566 F.2d 528.) This is so because the defendant's actions gave the officer no reason to believe that the defendant was committing an offense, was about to commit an offense, or had committed an offense. In this absence, the officer had no authority to stop the defendant's car, and the tainted fruit of the search should be suppressed. *People v. Lang.*

The State urges that the trial court's decision be affirmed for two reasons. The State argues that the officer stopped the car not only to see if the defendant needed assistance, but also because he was suspicious of the area and that this makes the stop lawful, and the evidence admissible. We believe this argument to be erroneous. Assuming that the officer was suspicious (although this reason was not mentioned in the officer's report or his grand jury testimony), we believe this suspicion was not more than an inarticulable hunch which is not sufficient to justify the stop. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *People v. Barnes* (1979), 70 Ill. App. 3d 566, 388 N.E.2d 809.) As we stated before, defendant took no actions inconsistent with day-to-day legal activities.

While the area was basically industrial and had had two recent burglaries, it was not plagued by a high crime rate. Therefore, we do not believe the circumstances were such that a reasonable man would be able to infer the past, present or future commission of an offense from the defendant's actions.

■ The State's second argument is that the defendant did violate a law in that the parking lot he turned around in was private property and allegedly had "No Trespassing" signs posted. The presence of the signs is disputed, with the defendant claiming he saw none when he turned in and Officer Ragon claiming they were there. Assuming that there were signs, we do not believe this was a sufficient explanation for the stop. The defendant's action in turning in was consistent with Officer Ragon's conclusion that the defendant needed assistance. Ragon admitted he did not stop the car because the defendant was trespassing and that he had no intention of issuing a citation for trespass. There is nothing in his report to show that the parking lot's being private property aroused the defendant's suspicions. Therefore, we believe that this factor was not enough to justify a stop.

For the abovementioned reasons, we believe the defendant's car was not stopped for justifiable reasons and that the evidence garnered from the stop should have been suppressed. We therefore reverse and remand.

Reversed and remanded.

SCOTT, J., concurs.

Mr. JUSTICE STENGEL, dissenting:

I respectfully dissent.

In its order denying defendant's motion to suppress, the trial court found:

> "[T]hat on September 26, 1978, at approximately 4:45 A.M. Officer Randy Ragon * * * observed the [d]efendant driving a vehicle at a slow rate of speed in the vicinity of Wesley Road * * *. Officer Ragon observed the [d]efendant drive into a business/industrial area that was not open for business at that hour of the morning, and which was a high-crime area, several burglaries having been reported in that area. Officer Ragon further observed the [d]efendant drive into a railroad yard which was posted: 'No Trespassing.' Officer Ragon followed the [d]efendant's vehicle, thinking that either the [d]efendant was lost and needed help or was about to engage in some criminal activity."

A trial court's findings of fact in connection with a motion to suppress evidence should not be disturbed on appeal unless they are manifestly

erroneous. (*People v. Conner* (1979), 78 Ill. 2d 525, 401 N.E.2d 513; *People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280.) Because I believe that the findings of fact in the instant case are not manifestly erroneous, but on the contrary the evidence sufficiently supports the denial of defendant's motion to suppress, I would affirm.

In *People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1624, police officers stopped and frisked two men walking down Washington Street in Peoria at 12:50 a.m. The two men were wearing black clothing. A .22-caliber automatic pistol was found concealed under the defendant's belt, and he was charged with unlawful use of a weapon (Ill. Rev. Stat. 1973, ch. 38, par. 24—1(a)(4)). At the hearing on the defendant's motion to suppress certain evidence, including the pistol, one of the officers testified that, although he had received no reports of burglaries in the few hours before the stop, he knew from having patrolled the area that it was a commercial and industrial area which had suffered a number of burglaries. He said it was unusual to see people in that area at that time of night, but he admitted he was aware that a tavern, open until 1 a.m., was located about two blocks from where he stopped the defendant and his companion who were headed in the general direction of the tavern. The Illinois Supreme Court held the stop was legal, stating:

> "[W]hile it is possible that the defendant and his companion were merely on their way to Penn's Tavern to have a fast drink before closing time, we agree that it was much more likely that persons dressed in black, walking in the dead of night through an otherwise deserted commercial and industrial area which had been plagued by burglaries, had just committed or were about to commit a burglary. Under these circumstances, the suspects easily might have eluded the officers had the officers attempted to observe the two suspects further rather than stopping them immediately. Hence, we agree that Officer Fulton's inference of an imminent or recent burglary was reasonable, and that stopping the defendant therefore was reasonable under the circumstances." 69 Ill. 2d 73, 78-79, 370 N.E.2d 537, 540.

In the instant case, defendant's car was seen traveling slowly and turning into a parking lot in a business area with industries and warehouses, located in a neighborhood which had been the site of two recent burglaries, at 4:45 a.m. when all of the businesses were closed except the railroad which had a skeleton crew. The car was seen turning around about one-half block onto the railroad yard, which was private property and posted with "No Trespassing" signs. The car was then seen driving slowly away from the business area in the direction from which it had come. Since Officer Ragon testified he did not believe defendant

had time to get out of his car while on the railroad yard, it appeared unlikely that defendant had any business with the railroad's skeleton crew. As in *McGowan*, based on the facts perceived and known by the police, it was possible that defendant was engaged in perfectly legal activities. It was much more likely, however, that he drove into the railroad yard intending to commit the third recent burglary in the neighborhood. Under these circumstances the stop was legal. See *People v. Hellemeyer* (1975), 28 Ill. App. 3d 491, 328 N.E.2d 626.

In holding the stop of defendant illegal, the majority relies principally on the case of *People v. Lilly* (1976), 38 Ill. App. 3d 379, 347 N.E.2d 842, which is readily distinguishable. In *Lilly* the police stopped a car about 10:30 p.m. after it slowed down on a one-lane gravel road and pulled over to the right. There is no indication that the area of the stop had been the site of recent crimes, or that the defendant drove his car onto private property.

For the reasons stated above, I would affirm defendant's conviction.