THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLIFFORD A. "TONY" DYER, Defendant-Appellant.

Fifth District   No. 5—85—0050

Opinion filed March 5, 1986.

HARRISON, J., dissenting.

Randy E. Blue and Larry R. Wells, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Barbara Adams, State's Attorney, of Hillsboro (Kenneth R. Boyle, Stephen E. Norris, and Ken Torricelli, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:
Defendant, Clifford A. "Tony" Dyer, was charged with armed rob-

bery and armed violence. Following a jury trial in the circuit court of Montgomery County, he was found guilty and sentenced to concurrent terms of 15 years for armed robbery and 30 years for armed violence. Defendant appeals. We affirm.

The pertinent facts adduced at trial are as follows:

Deputy Sheriff Tom Unser testified that he was notified at approximately 10:23 p.m., on July 1, 1984, that a clerk at Fuller Brothers Liquor Store had been robbed at gunpoint. He immediately responded to the call and arrived there by 10:25 p.m. He was told that two white males wearing masks had entered the store from the back door, threatened the clerk with a shotgun, taken money from the cash register, and fled out the back door. He testified that he remained at the store less than a minute to hear the victim's version of the crime. He then immediately proceeded to patrol the road directly in back of the store—the Fillmore Blacktop Road. Approximately two miles south of the store, he saw a vehicle's taillights. The vehicle was heading south, away from the crime scene. This vehicle was the only vehicle he saw in the vicinity of the crime. He explained that the area was virtually undeveloped and that there were no other stores, restaurants, or bars in the area.

Deputy Unser testified that the vehicle was traveling on a road that intersected with the Fillmore Blacktop, 1500 E. When he arrived at 1500 E's intersection with the Fillmore Blacktop, he turned onto 1500 E and drove toward the other vehicle at an excessive rate of speed. He momentarily lost sight of the vehicle as it crested a hill. He continued south and was met by what he perceived to be the same vehicle he had been following, traveling at an excessively slow rate of speed. Deputy Unser stated that he continued down the road and turned west onto a private drive in order to back up and follow the vehicle. He further testified that when he turned into a driveway he observed recent track marks where a vehicle had backed out, confirming his original conclusion that the vehicle which had passed him had turned around. He relayed the car's license number by radio for a check because he considered the car's reversing direction a suspicious move. He turned on his squad car's red lights and stopped the car.

Deputy Unser testified that he approached the vehicle on foot and observed three white males in the car. He stated he did not have his gun drawn but requested the driver to exit the vehicle and place his hands on the roof of the car. He recognized the driver as Jeff Smith and the other occupants as Paul Seago and Clifford "Tony" Dyer. Deputy Unser asked Smith for his driver's license and called it in. Deputy Unser also called for assistance. Sheriff Moore, Deputy Kim-

bro, and Deputy Hamrock arrived to assist him. Sheriff Moore received permission to search the car but found nothing. He then drove to the liquor store, spoke to the clerk, and returned to the stop. He took notes on the clothing worn by the three men and drove back to the liquor store, where one of the clerks informed him that she might be able to identify one of the robbers. The sheriff immediately returned to the scene of the stop and asked the men if they would go to the Fuller Brothers Liquor Store to let the clerk have a look at them. Dyer queried, "If the clerk doesn't identify anybody, can we go?" The sheriff agreed and led the way to the store in the squad car. Deputy Kimbro followed behind the Smith car. The sheriff then showed the three men to one of the clerks, and she identified Mr. Smith as the man who had worn a dark nylon stocking over his face during the robbery. She also told the police that Mr. Dyer had the same build as the man who had worn the ski mask and carried the gun during the robbery. The three men were taken to jail and on July 2, 1984, charges of armed robbery and armed violence were filed.

Bills of indictment on those charges were returned July 12, 1984, and the defense filed a motion to quash the arrest for lack of probable cause and suppress the resulting evidence on August 3, 1984. A hearing was held on September 13, 1984, and the motion was denied.

On December 5, 6, and 7, 1984, defendant was tried before a jury and found guilty of armed robbery and armed violence.

Defendant appeals, contending that the trial court erred in denying defendant's motion to quash the arrest for lack of probable cause and suppress the evidence that resulted therefrom. Defendant asserts that the arresting officer stopped the car in which the defendant was a passenger on bare suspicion and arrested the defendant with no further facts to form probable cause.

We must initially note that the trial court's findings as to the time the actual arrest occurred are somewhat ambiguous. Therefore we will now provide the court's findings in their entirety and examine them.

> "Having considered the evidence presented at the hearing on motion to quash arrest and suppress evidence and the memorandum in support of said motions the court makes the following findings: 1) the defendants were under arrest and 2) there was probable cause for defendants' arrest. Deputy Unser took a route of pursuit on a rural county road which, under the circumstances, was the route most likely taken by the suspects and he took pursuit within minutes of the occurrence. Deputy Unser saw only one vehicle and followed it. Being very familiar

with the rural area, when the vehicle turned around in a country lane, Deputy Unser made a judgment the vehicle was taking evasive action and stopped the vehicle. In the vehicle were the three defendants charged in this cause. The court concludes Deputy Unser had probable cause to stop the vehicle. Did the officer have probable cause to hold the defendants for further investigation? The court concludes the officer had reasonable suspicion that these defendants had committed a crime. An armed robbery had occurred in a small rural county—an unusual occurrance [sic] for this county. Found near the Hillsboro scene were three Litchfield residents familiar to law enforcement officers. Each of the three defendants has a history of criminal activity. One has a previous conviction for armed robbery. These defendants and their criminal propensities are well known among law enforcement in the county. This fact, combined with defendants traveling on a rural road at that time of evening away from their communities of residence and all other circumstances, can lead to no other conclusion but that the officer had probable cause to detain these defendants. We are not considering proof beyond a reasonable doubt but simply probable cause. The court finds the officers conduct constitutionally acceptable and denies the motions. Clerk to notify counsel.''

We note that the initial broad findings of the court indicate that defendants were under arrest and that there was indeed probable cause for the eventual arrest. However, the court fails to state exactly when the arrest occurred. In the detailed explanation given by the court, the court stated that Deputy Unser had probable cause to stop the vehicle. This indicates that the court was referring to an investigatory stop, not an arrest. Next the court rhetorically asks, "Did the officer have probable cause to hold the defendants for further investigation?" This statement again indicates that the court at this point still considered the detainment to be an investigatory stop, not an arrest. The court eventually concluded that the police had probable cause to detain the suspects for further questioning. Thus we find we must address two issues: (1) whether the investigatory stop was proper, and (2) whether there was probable cause for arrest, and, if so, when it occurred.

We first consider the permissibility of the investigatory stop. With *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, the United States Supreme Court recognized a limited exception to the probable cause requirement, which was intended to allow police to briefly detain a person for investigatory purposes. Under Illi-

nois codification of the *Terry* rule (Ill. Rev. Stat. 1983, ch. 38, par. 107—14), a police officer may, after identifying himself, stop a person in a public place for a reasonable period of time if the officer reasonably infers from all of the circumstances that a person is about to commit or has committed an offense. A mere hunch or suspicion is not sufficient to justify an investigatory stop. *People v. Waln* (1983), 120 Ill. App. 3d 73, 76, 457 N.E.2d 979, 980.

Deputy Sheriff Tom Unser testified both at trial and at a hearing on defendant's motion to quash arrest for lack of probable cause and suppress the evidence. On July 1, 1984, at approximately 10:20 p.m., he was notified that a clerk at Fuller Brothers Liquor Store had been robbed at gunpoint. He responded to the call immediately and was able to reach the store in about "one or two minutes." He heard the victim telling the other officer at the scene that two white males had entered the back door of the store and were armed with a shotgun. He immediately left the store to check for any suspicious vehicles in the area. He began to patrol the road directly in front of the defendant's departure point—the Fillmore Blacktop Road. After traveling down the road for a few minutes, Deputy Unser noticed a vehicle that was heading south on a side road of the Fillmore Blacktop, away from the scene of the crime. The vehicle was only two miles from the scene of the crime and was the only car he observed in the vicinity. Deputy Unser further stated that there were no stores, restaurants, or bars in the area, just farms and farmland. He stated that when he got to the intersection of 1500 E—the road he had spotted the other car on—he went south onto it. He then momentarily lost sight of the vehicle after it crested a hill. He proceeded south and met the vehicle coming very slowly back toward him. He realized that it was the same vehicle he had been following because he had visibility of a quarter to one-half a mile before reaching the hill and observed no other cars in the area. He got the license plate number of the vehicle and turned around in a driveway and proceeded north. When he turned into the driveway, he noticed that there were track marks where a vehicle had recently backed out of the same driveway. Given the circumstances— the recent robbery, the absence of other cars on the road, and the rural setting—he considered the car's change of direction suspicious and stopped the vehicle in which defendant was a passenger. The aforementioned facts, particularly the extreme spatial and temporal proximity to the crime, establish reasonable cause for the initial stop of the car in which defendant was riding.

Defendant argues that there was no evidence that more than two people were involved in the robbery and that there was no evidence

that an automobile was used in committing the robbery. However, an investigatory stop may be justified through the use of rational inferences derived from the facts. (*Terry v. Ohio* (1968), 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880.) We find it was reasonable for Deputy Unser to believe that an automobile and driver had been waiting for the two robbers who entered the liquor store. See *People v. Carlton* (1980), 81 Ill. App. 3d 738, 741, 402 N.E.2d 310, 314.

Defendant also contends that the car's reversal of direction was not suspicious. (See *People v. Fox* (1981), 97 Ill. App. 3d 58, 421 N.E.2d 1082; *People v. Deppert* (1980), 83 Ill. App. 3d 375, 403 N.E.2d 1279.) However, in the instant case, unlike *Fox* and *Deppert*, the deputy knew of a specific recently reported crime and did not merely observe "suspicious" activity in a general area where crimes had previously been committed. Thus, we find that there were ample specific and actionable facts to support the investigatory stop of the vehicle.

We also find that there was probable cause to arrest defendant, but because we infer from the trial court's findings that defendant's arrest occurred at some time during the initial stop, we must disagree with those findings. In any event, the controlling question before a reviewing court is correctness of trial court's conclusion, not the validity of its rationale. (*People v. Tobe* (1971), 49 Ill. 2d 538, 547, 276 N.E.2d 294, 300.) We affirm the trial court's denial of defendant's motion to quash and suppress evidence. However, after closely examining the facts, we find that an arrest did not occur until the suspects returned to Fuller Brothers Liquor Store and were identified.

The elements necessary to constitute an arrest are: (1) the authority to arrest; (2) assertion of that authority with the intent to effect an arrest; (3) restraint of the person to be arrested. (*People v. Robbins* (1977), 54 Ill. App. 3d 298, 302, 369 N.E.2d 577, 579.) In determining whether there is a custodial detention sufficient to make applicable a requirement of probable cause, numerous factors are looked to, including the demeanor of the police officer, display of a weapon by an officer, physical touching of the person, and the use of language or tone of voice. Other considerations include whether defendant is handcuffed or placed in a squad car, as well as the duration of detention. (See *People v. Vena* (1984), 122 Ill. App. 3d 154, 162, 460 N.E.2d 886, 892.) However, in assessing whether a detention is too long in duration to be justified as an investigatory stop, we must consider whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. *United States v. Sharpe* (1985), 470 U.S. 675, 686-87, 84 L. Ed. 2d

615-16, 106 S. Ct. 1568, 1575-76.

■ Sheriff Moore and Deputy Unser both testified that the stop lasted a brief time, approximately 20 minutes. However, defendant stated at the motion hearing that they were at the initial stop for approximately 45 minutes to one hour. During this time period, Sheriff Moore went back and forth between where defendants were stopped and the scene of the crime in an attempt to gain further information. There was no indication that the police unnecessarily prolonged the detention. As soon as he was told by one of the victims that she could identify the robbers, the sheriff asked the suspects whether they would agree to accompany him to the scene of the crime. Defendant inquired, "If the clerk doesn't identify anybody, can we go?" and the sheriff replied, "Yes." Thus it appears that defendant agreed to accompany the police back to the scene of the crime. Furthermore, defendants then drove their own vehicle back to Fuller Brothers Liquor Store. We find nothing unreasonable in asking the defendants if they would be willing to go to the scene of the crime, nor do we find any indication that the police acted less than diligently. (See *People v. Lippert* (1982), 89 Ill. 2d 171, 432 N.E.2d 605, *cert. denied* (1982), 459 U.S. 841, 74 L. Ed. 2d 85, 193 S. Ct. 92.) At Fuller Brothers Liquor Store, the defendant was generally identified by the victim and arrested.

For the foregoing reasons, the judgment of the circuit court of Montgomery County is affirmed.

Affirmed.

JONES, J., concurs.

JUSTICE HARRISON, dissenting:

I respectfully dissent. As the majority acknowledges, a mere hunch or suspicion is not sufficient to justify an investigatory stop of a motor vehicle (*People v. Waln* (1983), 120 Ill. App. 3d 73, 76, 457 N.E.2d 979, 980), yet that is precisely the basis upon which Deputy Unser decided to stop the automobile in which defendant was a passenger. When Unser set out on his patrol, he knew only that the Fuller Brothers Liquor Store had been robbed by two white males wearing masks and armed with a shotgun who fled by the back door. He was given no description of the suspects' getaway vehicle, was not advised as to its direction of travel and, indeed, was not even told that the suspects had escaped by car.

Upon leaving the crime scene, Unser proceeded south down the

Fillmore Blacktop Road. There is no indication that this was the only road running past the liquor store. Unser seems to have chosen it simply because it was directly in front of the point where the suspects were reported to have departed from the store. Why Unser decided to drive south is never articulated.

Unser stopped the auto in which defendant was riding approximately two miles from the crime scene. Unser testified that there were no stores, restaurants or bars in the area, precluding the possibility that the occupants had been patronizing such establishments prior to being stopped. Other evidence showed, however, that there was a house behind the liquor store and a tire store across the street. In addition, there were farms in the vicinity from which traffic may have originated. Unser's assessment of the situation failed to take these factors into account.

After Unser had first begun to follow the car, it apparently turned around and headed back the same direction from which it had come, *i.e.*, toward the crime scene. According to the State, Unser believed this maneuver to be "suspicious or evasive" in light of the "attendant circumstances." To anyone who has been lost on a dark, rural road late at night, this conclusion is somewhat frightening. Under the facts present here, it also strains credulity. The auto was stopped approximately seven minutes after the crime was reported, but only two miles from the scene. This was no hasty escape. Indeed, after turning around, the auto continued to travel at a slow rate of speed. The auto violated no traffic laws, made no attempt to elude Unser's patrol car, and pulled over immediately when Unser activated his car's overhead lights. Unser did not report seeing any furtive gestures by any of the car's occupants and, prior to the stop, did not know their identities or realize their "criminal propensities." The conduct of the defendant and the other persons in the car, when viewed objectively, was thus entirely consistent with legal, day-to-day activity. See *People v. Deppert* (1980), 83 Ill. App. 3d 375, 381, 403 N.E.2d 1279, 1283.

Unser stated that the auto was the only vehicle he had seen on this road that night. A more accurate characterization might be that it was simply the first automobile Unser happened to encounter during his brief patrol after learning of the robbery. Considering the totality of the circumstances, I do not believe that the actions of the occupants of the car gave Unser any reasonable basis to suspect that they were committing, were about to commit, or had committed any offense. This is confirmed by the following colloquy between counsel and Unser, himself, at a hearing held in this cause on September 13, 1984:

"Q. At the time you stopped the defendants' car, did you have any reason to believe that they had committed the armed robbery in question?

A. Not at that time."

Because the stop of the car in which defendant was riding was based not on reasonable suspicion, grounded on specific and articulable facts, but on a mere hunch, that stop was illegal. (*People v. Deppert* (1980), 83 Ill. App. 3d 375, 403 N.E.2d 1279; *People v. Fox* (1981), 97 Ill. App. 3d 58, 421 N.E.2d 1082.) The evidence resulting from defendant's subsequent arrest should therefore have been suppressed, and his motion should have been granted. Accordingly, I would reverse.