THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SIDNEY B. PASKINS.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS D. NOEL, Defendant-Appellant.

Third District   Nos. 3—86—0413, 3—86—0414 cons.

Opinion filed April 10, 1987.

Peter A. Carusona, of State Appellate Defender's Office, of Ottawa, for appellant Sidney B. Paskins.

Verlin R. Meinz, of State Appellate Defender's Office, of Ottawa, for appellant Thomas D. Noel.

John A. Barra, State's Attorney, of Peoria (Gary F. Gnidovec and John X. Breslin, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE BARRY delivered the opinion of the court:

Defendants Thomas Noel and Sidney Paskins appeal from their convictions of the offense of residential burglary. The defendants were tried jointly in the circuit court of Peoria County—Noel by a jury, and Paskins by the bench. Upon findings of guilty, defendants were sentenced to serve 9½ and 13 years, respectively, in the Department of Corrections.

The only issue on appeal is whether the trial court erred in denying defendants' motions to quash arrest and suppress evidence. We af-

firm.

On October 17, 1985, at about 10:28 a.m., Henry Brooks telephoned the office of the Peoria County sheriff to report a possible burglary at 913 North Norwood Boulevard. Deputy Sheriff David Owen responded, arriving at the residence in question about 3 minutes later. Brooks told Owen that he had returned home to his residence next door to 913 North Norwood Boulevard and observed a blue Chevrolet in the driveway of 913 North Norwood Boulevard, where his daughter, Tina Utsinger, and Chester Stamm lived. A black male was driving the Chevrolet and attempting to pull out when Brooks blocked his passage. The Chevrolet became mired in mud when it attempted to drive around Brooks' car. The driver then got out and fled on foot. Brooks tried to tackle him, but missed. At that point, Brooks went back into his own home and telephoned the police.

Brooks described the man as a black male in his late twenties, huskily built, about 5 feet 6 inches or 7 inches tall, weighing about 200 pounds, and wearing a blue T-shirt and dark, possibly brown, pants. Brooks told Owen that he had reason to suspect that the man may have gone back into his daughter's house because of the frantic barking of a dog in the garage. Owen entered the house and found that it had been ransacked. After having been on the premises for about 10 minutes, Owen radioed in Brooks' description of the person he had seen for broadcast over ISPERN to other police personnel.

State Trooper William Johnston, who had arrived at 913 North Norwood shortly after Owen, began to patrol the area looking for a possible suspect when the description given by Brooks was dispatched. Meanwhile, around 10:42 a.m., Peoria County Sheriff's Officer Richard Layne was filling his car with gas at the County Highway Department garage located about .6 of a mile south of the Utsinger residence. He observed two black males walking south between the coroner's office and the Bellwood Nursing Home. Both men were wearing dark pants. The shorter wore a brown coat and a shower cap and the taller, a dark blue coat. Layne, who was aware of the possible burglary at 913 North Norwood Boulevard, checked with a man working construction at the coroner's office to find out whether any black males were employed at that site. He learned that none were. Then Layne telephoned the ISPERN dispatcher and asked whether any descriptions had been given in connection with the recent burglary at 913 North Norwood. The dispatcher told him only that a black male was suspected. Layne immediately broadcast his observation of the two black males he had just sighted as possible suspects.

Trooper Johnston received Layne's broadcast around 10:45 a.m.

At 11:07 a.m., Johnston observed two black males matching the descriptions provided by Layne. They were walking along the railroad tracks approximately three miles east of where Layne had first seen them. Johnston stopped his car, got out, and, with his weapon drawn, ordered the men — defendants Paskins and Noel — to approach him. Defendants complied, and Johnston, who was alone at the time, ordered them to lie face down on the side of the road while he waited for the arrival of backup units. Three or four minutes later, Lieutenant Sample arrived at the scene. Johnston then placed defendants against a car and patted them down. Johnston felt a hard bulge in Paskins' jacket pocket. He reached inside and found a clump of jewelry — several watches, rings, and a necklace. Johnston handcuffed both defendants. A little later Owen arrived with Brooks. Brooks walked over to observe defendant Noel. According to Owen, Brooks said, "That looks like the guy."

The jewelry recovered from Paskins was later identified as items belonging to Tina Utsinger and Clifford Stamm which were missing from their residence after the burglary of October 17, 1985.

After hearing the foregoing evidence, the trial court denied defendants' motions to quash arrest and suppress evidence. The court found that the defendants' warrantless arrest was based upon probable cause.

On appeal, defendants contend that the trial court properly concluded that an arrest had occurred, but that such arrest was invalid for lack of probable cause to believe that defendants had committed or were committing any crime. Defendants posit that they were arrested at the point that Johnston, with weapon drawn, ordered them to approach and to lie face down on the side of the road.

The State concedes that Trooper Johnston lacked probable cause to arrest when he initially ordered defendants to approach him. The State argues, however, that Johnston had an articulable suspicion sufficient to justify a *Terry* stop and that subsequent facts that developed within the permissible bounds of a *Terry* investigation provided Johnston with the requisite probable cause to arrest defendants. The State theorizes that a formal arrest did not take place until after Johnston had discovered the items of jewelry on Paskins and Brooks had made a show-up identification of Noel. In the alternative, the State urges that we affirm the decision of the trial court on the ground that, even were defendants' arrests illegal, the "inevitable discovery rule" would preclude suppressing evidence obtained as a result of the alleged illegality.

It is our duty on appeal to review the evidence of record to deter-

mine the correctness of the trial court's decision to deny defendants' motions to quash arrest and suppress evidence, not the validity of its rationale. (*People v. Dyer* (1986), 141 Ill. App. 3d 326, 490 N.E.2d 237.) Thus, the fact that the trial court did not state at what point it found defendants were arrested is of no particular moment. Having reviewed the record before us in its entirety, we find that the trial court's conclusion here should be upheld.

Under *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, an officer may stop a person for a limited investigation if he has specific, articulable facts and inferences that would lead to a reasonable suspicion of criminal activity. Force reasonably necessary to protect the officer may be used to effectuate the stop. Further, *Terry* permits a limited protective search of a suspect's outer clothing if the officer has reason to believe the suspect may be armed. *Terry* stops are also authorized by the Illinois "stop and frisk" statutes. Ill. Rev. Stat. 1985, ch. 38, pars. 107—14, 108—1.01.

■ Defendants do not dispute that Johnston's discovery of the jewelry on Paskins and Brooks' show-up identification of Noel gave Johnston probable cause to arrest both defendants. Defendants contend, however, that Johnston lacked an articulable suspicion that they had committed any offense when he initially stopped them. Johnston did not have within his knowledge at the time of stopping the defendants the fact known to Deputy Layne that no black persons were reportedly employed at the construction site in the immediate vicinity. The record did establish that the area where Johnson observed defendants was primarily wooded and rural. Apparently the two black men were occupied only at walking along the railroad tracks when Johnston saw them there shortly after 11 that morning. Johnston's observation took place within the spatial and temporal proximity of the crime and Layne's earlier report of two suspects. Also, Johnston had been given a general description of a black male suspect from his investigation at the Utsinger residence and Owen's broadcast. That suspect had reportedly fled the scene of the crime on foot. Further, Johnston had the benefit of Layne's dispatch, which indicated that the first suspect may be accompanied by another black male who was wearing a shower cap. These facts, together with rational inferences, were sufficient to give Johnston an articulable suspicion when he first observed defendants that they may have committed the recent burglary.

■ Next, we focus on the reasonableness of Johnston's conduct between the time he initially stopped defendants and the point when he had probable cause to arrest them. Defendants correctly state that

the drawing of an officer's weapon, his tone of voice, and handcuffing of the defendants are factors which may indicate that an arrest has been made. (*People v. Dyer* (1986), 141 Ill. App. 3d 326, 332, 490 N.E.2d 237, 242.) They are not, however, conclusive. In a proper case the foregoing factors, even, as here, in combination, will not convert a legitimate investigative stop into a formal arrest. As noted in *People v. Roberts* (1981), 96 Ill. App. 3d 930, 933-34, 422 N.E.2d 154, 156, "[d]uring the period of [an] investigation, the person's freedom of movement is restricted. He is no more free to leave than if he were placed under a full arrest. The [crucial] difference between an arrest and a stop lies not in the initial restraint on movement, but rather on the length of time the person may be detained and the scope of investigation which may follow the initial encounter."

■ When Officer Johnston first encountered defendants, he was alone in a rural, sparsely populated area. He was investigating a very recent residential burglary. Under the circumstances, it was not unreasonable for Johnston to suspect that he may be in danger of attack. In a factually analogous setting, our supreme court upheld the denial of defendant's motion to suppress evidence obtained during an investigatory stop and pat-down search in *People v. McGowan* (1977), 69 Ill. 2d 73, 79, 370 N.E.2d 537, 540, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1624. In response to defendant's contention that the officer there, acting upon his suspicion that defendant may have committed a burglary, lacked adequate grounds to conduct a pat-down search for weapons, the court observed that "[i]t is not unlikely that a person engaged in stealing another person's property would arm himself against the possibility that another person will appear unexpectedly and object strenuously." 69 Ill. 2d 73, 79, 370 N.E.2d 537, 540.

Similarly in this case before us, we find that Johnston was justified in drawing his weapon to effectuate the stop. Moreover, the record establishes that Johnston did not aim his weapon at either defendant. He ordered them to lie face down along the roadside while he waited three or four minutes for the arrival of backup units. The obvious intrusiveness of this measure did not vitiate the stop, since it was of very limited duration. The record discloses that immediately upon the arrival of backup personnel, Johnston had the defendants stand up for pat-downs, and in Paskins' jacket Johnston felt an unidentified bulge.

The record does not conclusively demonstrate whether the defendants were handcuffed immediately before or after Johnston removed the clump of jewelry from Paskins' pocket. Defendants' testimony

was not consistent with that of Johnston on this point. Defendants testified that Johnston placed them in handcuffs before removing the jewelry. Johnston testified that he had removed the clump of jewelry from Paskins' jacket pocket before handcuffing either defendant, but he could not recall which defendant he had handcuffed first. In any event, it appears that the handcuffing took place nearly contemporaneously with the pat-down procedure. Upon Johnston's inquiry abut the hard bulge, Paskins gave an evasive response, "My stuff." Under the circumstances, reasonable caution at that point would have justified the handcuffing of both defendants within the permissible bounds of an investigatory stop for the limited period needed to confirm or dispel the possibility that defendants in fact bore concealed weapons. *People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537.

■ Thereafter, Johnston's discovery of the jewelry gave him probable cause to arrest Paskins, who wore the shower cap, and to further detain Noel, whose blue sweatshirt and pants were consistent with the description provided by Brooks at the scene of the burglary. Moments later, Owen arrived with Brooks, who identified defendant Noel as the man he had seen running from the scene of the burglary. The showup identification provided the requisite probable cause to arrest Noel.

Defendants resist our conclusion, arguing that an affirmance here will effectively obviate any meaningful distinction between an investigatory stop and an arrest. We do not agree. Each case must be evaluated upon its own facts. (*People v. Vena* (1984), 122 Ill. App. 3d 154, 460 N.E.2d 886.) The permissible bounds of an investigatory stop must be flexible enough to permit a restraining officer to take the least intrusive measures necessary within the dictates of reasonable prudence for his own protection to maintain the status quo and to diligently pursue a means of investigation that is likely to confirm or dispel his suspicions quickly. (See *People v. Dyer* (1986), 141 Ill. App. 3d 326, 332, 490 N.E.2d 237, 242 (citing *United States v. Sharpe* (1985), 470 U.S. 675, 686, 84 L. Ed. 2d 605, 615-16, 105 S. Ct. 1568, 1575).) Of particular significance to our decision today is the fact that the investigative detention here lasted less than five minutes and did not entail transporting defendants away from the scene of the stop. (See *People v. Runnion* (1986), 150 Ill. App. 3d 879, 502 N.E.2d 439; Ill. Rev. Stat. 1985, ch. 38, par. 107—14.) The intrusions upon defendants' freedom during that period were reasonable and necessary responses to the situation as it developed during the *Terry* investigation. Having found that defendants' motions to quash arrest and suppress evidence were properly denied because probable cause for

defendants' arrest existed at the time of their arrest, we do not reach the State's alternative ground for affirming the trial court's judgment.

For the reasons stated, we affirm the judgment of the circuit court of Peoria County.

Affirmed.

STOUDER and HEIPLE, JJ., concur.