THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RANDY O'DELL, Defendant-Appellant.

Fifth District    No. 5—07—0682

Opinion filed July 21, 2009.

Michael J. Pelletier, Daniel M. Kirwan, and Michelle A. Zalisko, all of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Edward C. Deters, State's Attorney, of Effingham (Patrick Delfino, Stephen E. Norris, and Erin T. Piscitelli, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE WEXSTTEN delivered the opinion of the court:

Following a jury trial in the circuit court of Effingham County, the defendant, Randy O'Dell, was convicted on two counts of unlawful possession of a stolen vehicle (625 ILCS 5/4—103(a)(1) (West 2006)). On appeal, he argues that his convictions should be vacated because the circuit court erred in denying his motion to suppress. We affirm.

## BACKGROUND

On January 10, 2007, at approximately 3 a.m., Sergeant Ryan Shoemaker of the Illinois State Police was traveling south on the Dieterich/Clay City blacktop in rural Effingham County, when he observed an approaching truck traveling "unusually slow." The truck was a 2004 Dodge Dakota occupied by the defendant, a resident of Louisville, Illinois. As the truck neared, Shoemaker saw that it was pulling a trailer carrying another truck. Shoemaker later described the trailer as a 1983 single-axle "homemade trailer" of the type com-

monly used to haul ATVs, lawn mowers, "or any other kind of lightweight cargo." After turning around to follow the defendant, Shoemaker "noticed that the trailer was weaving somewhat recklessly from side to side as if it were overloaded." He also saw a dragging chain that was emitting sparks as it bounced off the road. At that point, Shoemaker stopped the defendant for equipment violations (see 625 ILCS 5/12—101, 15—110 (West 2006)).

When Shoemaker exited his squad car and approached the 2004 Dakota, he noticed that the truck on the trailer was a "brand new" 2007 Dakota with an attached window sticker listing its price as $33,025. The 2007 Dakota was not chained or strapped to the trailer, and Shoemaker thought it odd that such a nice truck was being transported unsecured on a "decrepit, lightweight junk trailer" in the middle of the night. He also found it curious that the new truck had no license plates or temporary registration. When Shoemaker advised the defendant why he had stopped him and told him that the truck on the trailer seemed suspicious, the defendant told Shoemaker that he "got [the truck] today." The defendant claimed that he had purchased the new truck from J Wilderman Autoplex in Mt. Carmel, the dealership listed on the window sticker. The defendant further claimed that he was transporting the new truck to Effingham. Shoemaker then returned to his squad car, ran the defendant's name and driver's license information, and checked the registration information on the trailer and the 2004 Dakota that the defendant was driving. Shoemaker learned that the defendant had multiple theft-related convictions, including prior convictions for unlawful possession of a stolen motor vehicle, and that, earlier that night at 12:06 a.m., the Mt. Carmel police department had also checked the registration information on the 2004 Dakota. He also learned that the trailer was registered to a business in Mt. Carmel. Shoemaker then contacted the Mt. Carmel police department and was advised that, when its registration had been run in Mt. Carmel at 12:06 a.m., the 2004 Dakota had not been pulling a trailer or another truck. Shoemaker asked the Mt. Carmel police to help him determine whether the 2007 Dakota had been stolen, and they agreed to attempt to contact employees of J Wilderman Autoplex. Shoemaker then returned to the defendant's truck, had him exit the vehicle, and patted him down for weapons. He and the defendant then returned to his squad car, where the defendant sat in the front passenger's seat. Approximately 20 minutes had passed since the defendant was initially stopped.

In the squad car, Shoemaker questioned the defendant about the 2007 Dakota and candidly stated that he believed that the vehicle was stolen. The defendant repeatedly admitted that the situation looked

suspicious, and he indicated that, if he were Shoemaker, he, too, would want to investigate the matter further. When Shoemaker asked the defendant at what time he had purchased the new truck, the defendant stated that he had done so sometime between 1:30 and 2 p.m. the prior day. The defendant indicated that he had then gone to Flora to work a factory shift that began at 3 p.m. and that, at around 11:30 p.m., he headed back to Mt. Carmel to pick up the new truck. Because it is approximately 60 miles from Flora to Mt. Carmel, Shoemaker thought that it was impossible for the defendant to have left Flora at 11:30 p.m. and been in Mt. Carmel by 12:06 a.m. Shoemaker also thought it suspicious that the defendant had not taken possession of the new truck when he bought it. When Shoemaker asked the defendant who had sold him the truck, the defendant stated, "Jimmy Hendrix," as if he had "just pulled the name out of the air." Although he had no documents indicating that he had, in fact, recently purchased the 2007 Dakota, the defendant did produce a business card of "Jimmy Winship," a salesman at J Wilderman Autoplex. When Shoemaker asked the defendant why he was headed to Effingham, the defendant stated that he was dropping the new truck off at his girlfriend's house on Sixth Street in Effingham. This, too, made Shoemaker suspicious, because he did not believe that there was a Sixth Street in Effingham. The defendant also indicated that his girlfriend had the paperwork for the new truck. The defendant further advised that he had paid $33,025 for the vehicle, and Shoemaker thought it "very unusual for somebody to write a check for exactly what is on the sticker of a brand new automobile."

In the meantime, the Mt. Carmel police department had called Shoemaker and informed him that they were attempting to contact the owner of J Wilderman Autoplex and were going to arrange for him to meet them at the dealership. Shoemaker subsequently told the defendant that he would find out sooner or later whether the new truck had been stolen. While waiting for the Mt. Carmel police department to get back to him, Shoemaker wrote the defendant warnings for various equipment violations and discussed the violations with him. He then told the defendant that he was going to let him go after he obtained the new truck's vehicle identification number (VIN). He had the defendant exit the squad car and stand by while he opened the new truck's driver's door and wrote down the truck's VIN. While obtaining the VIN, he noticed that a piece of plastic trim missing from around the driver's door of the new truck was lying on its backseat floorboard. He then looked inside the 2004 Dakota, and on its backseat floorboard, he saw a crowbar with paint transfer on it. The color of the paint transfer matched the color of the 2007 Dakota. Shoemaker

also observed a pair of bolt cutters, a saw, an assortment of ball hitches, and an assortment of truck-trailer "electrical connections" in the 2004 Dakota. He subsequently had the defendant sit inside the 2004 Dakota and wait. Approximately 60 minutes had passed since the defendant was initially stopped.

Eventually, additional officers arrived at the scene, and the Mt. Carmel police department called Shoemaker back again. The Mt. Carmel police told him, *inter alia*, that one of the buildings at J Wilderman Autoplex had been broken into. Shoemaker also spoke with the owner of the dealership, Jim Wilderman. Wilderman stated that, although he had been unable to contact salesman Jimmy Winship, he had spoken with the dealership's finance manager, who advised that there had been no transaction regarding the 2007 Dakota, as the defendant had claimed. At that point, the defendant was handcuffed and placed under arrest for possessing a stolen truck, a stolen trailer, and burglary tools. After Shoemaker read the defendant his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)), the defendant admitted that he had stolen the 2007 Dakota. Approximately 90 minutes had passed since the defendant was initially stopped, and the entire stop was captured on video by a camera mounted in Shoemaker's squad car.

On January 17, 2007, an Effingham County grand jury indicted the defendant for the charges on which he had been arrested. Thereafter, the defendant filed a motion to suppress the evidence obtained during the January 10, 2007, traffic stop. His motion alleged, *inter alia*, that Sergeant Shoemaker had detained him for investigatory purposes without reasonable suspicion that he had committed a crime.

On September 27, 2007, the Honorable James R. Harvey held a hearing on the defendant's motion to suppress. After hearing Shoemaker's testimony and watching the videotape recording of the traffic stop, Judge Harvey denied the motion, ruling as follows:

"The Motion to Suppress will be denied. The question here is whether or not[,] under the circumstances this officer was dealing with on the night in question[,] he acted appropriately ***. I find simply that he did.

Specifically, I think the law requires that I consider, and I do, *** whether or not the officer had reasonable suspicion. It's apparent in watching the tape that all the information which eventually led to [the] defendant's arrest didn't fall out of the sky or come tumbling out of the radio in one chunk. The officer saw something that looked suspicious. When he stopped the vehicle[,] he saw a little something else that looked suspicious. And as he kept asking

questions and getting answers that [were questionable], I think he was required to continue making inquiries.

We start off with *** the time, and we have a brand new expensive pickup truck inexplicably being [towed] in a remote area at 3:00 in the morning on what appears to be a junk, lightweight trailer. The *** vehicle is going slow[,] and I think it's [a] reasonable conclusion it was going slowly because it was not properly secured and the driver was afraid that[,] if he drove very quickly[,] *** the new pickup truck was going to part company with the junk trailer.

There was never an explanation from the defendant why he didn't just drive the new pickup home; why somebody didn't. I believe I heard, although the sound quality of the tape was not real good, when the officer asked if he had a receipt, I think I heard the words, 'She has it.' I don't know who this might have been except maybe the girlfriend, which leaves the question, how did she get the receipt? Um, the travel time between Flora and Mt. Carmel didn't make sense, as the officer pointed out.

Given all this, and *** [the] defendant's criminal history, which by this time the officer knew, which included multiple past convictions for theft and possession of stolen vehicles, *** nonetheless, he stated his intent to have the defendant on his way[,] and then in retrieving the VIN ***[,] he finds something else, he finds a piece of plastic trim off of a brand new vehicle ***. Then there's the crowbar with the paint on it. Then there's the fact that he paid sticker price, allegedly.

It was cold. The officer was by himself. He was in a remote area. The phone reception was not reliable. And much of the delay was occasioned by the fact that Mt. Carmel was not real prompt *** in getting back to him with information. Overriding all of this are the defendant's statements, 'I understand how suspicious this looks, and if I were you, I would do the same thing.' I think that kind of sums up what the officer was dealing with. I think it accurately sets forth his justification for further investigation, resulting in the development of facts which led to the charge[s]. I'm happy to let the appellate court review that. The Motion to Suppress is denied."

Prior to the trial, the State dismissed its possession-of-burglary-tools charge (720 ILCS 5/19—2 (West 2006)) and proceeded solely on the two counts of unlawful possession of a stolen vehicle. On October 3, 2007, an Effingham County jury found the defendant guilty on both counts. The defendant subsequently filed a timely notice of appeal.

## ANALYSIS

On appeal, suggesting that his 90-minute detention constituted an arrest without probable cause, the defendant argues that the circuit

court erred in denying his motion to suppress. The State counters that the defendant's detention did not exceed the permissible bounds of an investigatory stop supported by reasonable suspicion and, thus, did not constitute an illegal arrest. We agree with the State.[1]

"The fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution provide protection against unreasonable searches and seizures" (*People v. Johnson*, 387 Ill. App. 3d 780, 788 (2009), *appeal allowed*, 231 Ill. 2d 677 (2009)), and to be constitutionally reasonable, an arrest made without a warrant must be supported by probable cause (*People v. Rainey*, 302 Ill. App. 3d 1011, 1013 (1999)). "All evidence directly traceable to an arrest made without probable cause must be suppressed when there are no intervening events to break the connection between the illegal detention and the evidence obtained as a result." *People v. Skinner*, 220 Ill. App. 3d 479, 487 (1991). It is well established, however, that, absent probable cause to arrest, a law enforcement officer "may stop and temporarily detain an individual for the purpose of a limited investigation if the officer is able to point to specific articulable facts which, taken together with reasonable inferences drawn from the officer's experience, reasonably would justify the investigatory intrusion." *People v. Frazier*, 248 Ill. App. 3d 6, 13 (1993); see *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); 725 ILCS 5/107—14 (West 2006).

■ To be a valid investigatory stop, or "*Terry* stop," the investigating officer must have a reasonable, articulable suspicion that the person temporarily detained has committed or is about to commit a crime. *People v. Richardson*, 376 Ill. App. 3d 612, 617 (2007). "In evaluating the validity of an investigatory stop, the court must consider the totality of the circumstances." *People v. Kipfer*, 356 Ill. App. 3d 132, 145 (2005), citing *United States v. Sokolow*, 490 U.S. 1, 8, 104 L. Ed. 2d 1, 10, 109 S. Ct. 1581, 1585 (1989). An investigative detention "is distinguished from an arrest based on the length of

---

[1]The parties do not dispute that the initial stop of the defendant's vehicle was proper (see *People v. Moss*, 217 Ill. 2d 511, 527 (2005) ("A vehicle stop based on an officer's observation of a traffic violation is valid at its inception")); that, during the entirety of the roadside encounter, the defendant was "seized" (see *People v. Cosby*, 231 Ill. 2d 262, 273 (2008) ("[T]he detention by police of individuals during a traffic stop [is] a 'seizure' of 'persons' within the meaning of the fourth amendment")); and that our review of the circuit court's denial of the defendant's motion to suppress is *de novo* (see *People v. Gilbert*, 347 Ill. App. 3d 1034, 1038 (2004) ("Where no dispute exists as to the facts or witness credibility, the trial court's ruling on a motion to suppress will be reviewed *de novo*")).

detention and the scope of investigation," and the purpose of such a stop "is to allow a police officer to investigate the circumstances that provoke suspicion and either confirm or dispel his suspicions." *People v. Ross*, 317 Ill. App. 3d 26, 30, 31 (2000). "Although brief in nature, a *Terry* stop may last for a reasonable duration while the officer involved attempts to dispel or confirm his suspicions." *People v. Johnson*, 387 Ill. App. 3d 780, 790 (2009), *appeal allowed*, 231 Ill. 2d 677 (2009).

"The State bears the burden of showing that a seizure based on reasonable suspicion was sufficiently limited in scope and duration" (*People v. Staley*, 334 Ill. App. 3d 358, 366 (2002)), and "in assessing whether a detention is too long in duration to be justified as an investigatory stop, we must consider whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly" (*People v. Dyer*, 141 Ill. App. 3d 326, 332-33 (1986), citing *United States v. Sharpe*, 470 U.S. 675, 686-87, 84 L. Ed. 2d 605, 615-16, 105 S. Ct. 1568, 1575-76 (1985)). We must also consider "the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Sharpe*, 470 U.S. at 685, 84 L. Ed. 2d at 615, 105 S. Ct. at 1575. Although "[b]revity is an important factor in determining whether a detention was reasonable" (*People v. Welling*, 324 Ill. App. 3d 594, 602 (2001)), "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape" (*Adams v. Williams*, 407 U.S. 143, 145, 32 L. Ed. 2d 612, 616, 92 S. Ct. 1921, 1923 (1972)). There is not a *per se* time limitation on *Terry* stops, and "[m]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Sharpe*, 470 U.S. at 685, 84 L. Ed. 2d at 615, 105 S. Ct. at 1575.

■ Here, we agree with the circuit court's determination that the developing situation that resulted in the defendant's detention constituted an investigatory stop supported by reasonable suspicion. We further conclude that the length of the stop was not unreasonable under the circumstances.

It was certainly reasonable for Shoemaker to suspect that the truck on the back of the trailer that the defendant was hauling was stolen, and by promptly contacting the Mt. Carmel police department and having them check into the defendant's claim regarding his alleged purchase of the vehicle, Shoemaker diligently pursued a means of investigation that was likely to confirm or dispel his suspicions quickly. Given that the traffic stop occurred at 3 a.m., it is understand-

able that the information Shoemaker sought took some time to obtain. Furthermore, while waiting for the information, additional facts and observations that strengthened Shoemaker's initial suspicions arose, and long before he was able to definitively confirm that the 2007 Dakota had been stolen, his reasonable suspicion had arguably ripened into probable cause. See *People v. Moore*, 378 Ill. App. 3d 41, 47-48 (2007); *People v. Flores*, 371 Ill. App. 3d 212, 220-23 (2007). We need not decide whether that was the case, however, because we conclude that, under the circumstances, the 90-minute detention of the defendant was not too long in duration to be justified as an investigatory stop. See *United States v. Maltais*, 403 F.3d 550, 557 (8th Cir. 2005) (holding that an investigative detention lasting nearly three hours was not unreasonably long where the length of time required to confirm or dispel the officers' suspicions was attributable to the early morning hour and the location of the stop).

"Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *Sharpe*, 470 U.S. at 685, 84 L. Ed. 2d at 615, 105 S. Ct. at 1575. In the present case, however, the investigatory stop did "not involve any delay unnecessary to the legitimate investigation of the law enforcement officers" (*Sharpe*, 470 U.S. at 687, 84 L. Ed. 2d at 616, 105 S. Ct. at 1576). We therefore reject the defendant's contention that the stop in question constituted an arrest without probable cause.

## CONCLUSION

For the foregoing reasons, the circuit court's judgment denying the defendant's motion to suppress is hereby affirmed.

Affirmed.

CHAPMAN and STEWART, JJ., concur.