# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Hernandez*, 2012 IL App (2d) 110266

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. ALEJANDRO M. HERNANDEZ, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-11-0266 |
| Filed | June 27, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court erred in quashing an arrest for driving with a suspended license and suppressing evidence where, although the officer's reasonable suspicion that the vehicle was being operated by the owner, a woman whose license was suspended, dissipated after the deputy stopped the vehicle and discovered the driver was male, the extension of the stop past that point was justified when the defendant driver was unable to produce his license in response to the officer's request. |
| Decision Under Review | Appeal from the Circuit Court of Boone County, No. 10-TR-7435; the Hon. John H. Young, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Michelle J. Courier, State's Attorney, of Belvidere (Lawrence M. Bauer and Gregory L. Slovacek, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| | Robert V. Deters, of Botto Gilbert Schottland & Andrle, P.C., of Woodstock, for appellee. |
| | |
| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion. |
| | Justice Hutchinson specially concurred, with opinion. |
| | Justice Birkett specially concurred, with opinion. |

**OPINION**

¶ 1    The State appeals the grant of a motion by defendant, Alejandro M. Hernandez, to quash his arrest for driving with a suspended license (DWSL) (625 ILCS 5/6-303(a) (West 2010)) and suppress evidence. We reverse and remand.

¶ 2    According to the bystander's report of the hearing on defendant's motion, the sole witness, Deputy Schmitt of the Boone County sheriff's department, testified as follows. On June 11, 2010, at approximately 8:56 p.m., he was on routine patrol when he saw a car in front of him. A computer check revealed that the car had only one registered owner, Azucena Hernandez, and that her license was suspended. Schmitt recognized her name and the car because he had previously arrested her for DWSL. Schmitt decided to stop the car, but he did not first try to ascertain whether the driver matched Azucena Hernandez's description. After stopping the car, Schmitt approached the driver and learned that he was a male. The bystander's report then recounts the following events:

"The driver verbally identified himself as Alejandro Hernandez, DOB 07/22/1975. After running the driver's information, Deputy Schmitt learned that Mr. Hernandez had a suspended Illinois driver's license and arrested Mr. Hernandez for that offense."

¶ 3    The trial court granted defendant's motion. It found that Schmitt first "effectuated a traffic stop [and] approached the vehicle." "On his approach," the court continued, "it was clear that it was Alejandro Hernandez *** and clearly he's male." Schmitt "asked Mr. Hernandez for his driver's license" and defendant "said he didn't have one." Defendant "provided his name and date of birth." The judge explained that Schmitt initially had the reasonable suspicion needed for the stop because Azucena Hernandez had a suspended license. However, the reasonable suspicion dissipated as soon as Schmitt saw that the driver was male. The trial court then held that, once the reasonable suspicion dissipated, Schmitt should have explained the reason for the stop, apologized, and told defendant he was free to

-2-

go. After the trial court denied the State's motion to reconsider, the State timely appealed.

¶ 4    On appeal, the State contends that the stop of defendant was proper. The State's argument is not always clear.[1] However, the State's primary contention is that, even after Schmitt lost any basis to believe that Azucena Hernandez was illegally driving the car, he still had grounds for a reasonable suspicion that defendant had committed or was committing an offense.

¶ 5    Because the pertinent facts are undisputed, our review of the trial court's suppression order is *de novo*. See *People v. Gherna*, 203 Ill. 2d 165, 175 (2003). An investigative detention such as a traffic stop is permissible if the law enforcement officer reasonably suspects that the person detained has committed or is about to commit a crime. *People v. Galvez*, 401 Ill. App. 3d 716, 718 (2010). However, an investigative stop that is originally lawful must cease once reasonable suspicion dissipates. *United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993). Nevertheless, after a valid initial stop, an officer may approach a driver to explain the basis for the stop and request a license, even though reasonable suspicion has dissipated. *People v. Bradley*, 292 Ill. App. 3d 208, 211 (1997).

¶ 6    It is well established that a reasonable suspicion exists to stop a vehicle where it is being operated and the registered owner's license is suspended. *Village of Lake in the Hills v. Lloyd*, 227 Ill. App. 3d 351, 354 (1992). However, when an officer acquires information that the driver is not the registered owner, reasonable suspicion dissipates. *Cf. Galvez*, 401 Ill. App. 3d at 717, 719 (holding that, where an officer knew a vehicle had two registered owners, no reasonable suspicion for a stop existed where only one of them did not have a driver's license). In this case, Schmitt knew that the registered owner was female, and, after effectuating a valid stop, he learned that the driver was male. At this point, the basis for the stop dissipated. The next question we must answer is whether the extension of the stop past the point at which reasonable suspicion dissipated was constitutionally permissible.

¶ 7    As a threshold matter, we do not find it problematic that Schmitt approached the vehicle and asked defendant to identify himself or produce a driver's license. See *Bradley*, 292 Ill. App. 3d at 211 ("Consistent with *McVey*, *Arteaga*, and *McKnight*, we conclude that once [Officer] Dempsey properly stopped the car defendant was driving to determine whether the LAF sticker was valid and found that the sticker was valid, he could then approach defendant, explain to him why he had been stopped, and ask defendant to produce his driver's license. Under these circumstances, no seizure occurred when Dempsey did so."). At this point, defendant simply identified himself verbally and stated that he did not have a driver's license in his possession. This was an offense under section 6-112 of the Illinois Vehicle Code. 625 ILCS 5/6-112 (West 2010) ("Every licensee or permittee shall have his

---

[1]In part, this is because the State's brief attempts to incorporate by reference the arguments that it made in the trial court–a practice that courts of review have repeatedly disapproved and have held tantamount to forfeiture (see Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (points not argued on appeal are forfeited)). See *Wilson v. Department of Professional Regulation*, 344 Ill. App. 3d 897, 907 n.4 (2003); *Stenger v. Germanos*, 265 Ill. App. 3d 942, 952-53 (1994); *Gruse v. Belline*, 138 Ill. App. 3d 689, 698 (1985).

drivers license or permit in his immediate possession at all times when operating a motor vehicle and, for the purpose of indicating compliance with this requirement, shall display such license or permit if it is in his possession upon demand made, when in uniform or displaying a badge or other sign of authority, by a member of the State Police, a sheriff or other police officer or designated agent of the Secretary of State."). Since defendant did not have a driver's license in his possession, Schmitt had a reasonable suspicion sufficient to justify extending the stop. See *People v. Safunwa*, 299 Ill. App. 3d 707, 713 (1998) (holding that circumstances warranted the extension of a detention where the defendant did not produce a facially valid driver's license and instead produced a traffic citation). Accordingly, the trial court erred in granting defendant's motion.

¶ 8        For the foregoing reasons, the trial court's order granting defendant's motion to quash his arrest and suppress evidence is erroneous. Therefore, it is reversed, and the cause is remanded.

¶ 9        Reversed and remanded.

¶ 10        JUSTICE HUTCHINSON, specially concurring.

¶ 11        While I agree with my colleagues to reverse the trial court, I write separately to express my concern regarding the sufficiency of the bystander's report. The issue in this appeal is whether defendant's traffic stop constituted an unreasonable seizure within the meaning of the fourth amendment, and accordingly whether the trial court properly granted defendant's motion to quash and suppress. There is perhaps no greater responsibility this court is charged with than ensuring that the citizens of this state are afforded their guaranteed protections under the United States and Illinois Constitutions. Undertaking this important task requires an adequate record on appeal.

¶ 12        Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), the reasonableness of a traffic stop involves a dual inquiry: (1) whether the officer's action was justified at the inception of the stop; and (2) whether it was reasonably related in scope to the circumstances justifying the interference in the first place. *People v. Bunch*, 207 Ill. 2d 7, 13-14 (2003) (citing *Terry*, 392 U.S. at 19-20). Federal and Illinois law are well settled that the reasonableness of a *Terry* stop must be examined under the "totality of the circumstances." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). Under the second prong, a court should "consider the *length* of the detention and the *manner* in which it was carried out." (Emphases in original.) *Bunch*, 207 Ill. 2d at 14. "Brevity is an important factor in determining whether a detention was reasonable ***." *People v. Welling*, 324 Ill. App. 3d 594, 602 (2001). In considering the length of the stop, while there is no bright-line rule, courts should employ a " 'contextual, totality of the circumstances' " analysis that includes " 'the brevity of the stop and whether the police acted diligently during the stop.' " *People v. McQuown*, 407 Ill. App. 3d 1138, 1145 (2011) (quoting *People v. Baldwin*, 388 Ill. App. 3d 1028, 1034 (2009)). The State bears the burden of showing that a *Terry* stop was sufficiently limited in scope and duration. *People v. O'Dell*, 392 Ill. App. 3d 979, 986 (2009).

¶ 13        In the current matter, I agree that the initial stop was justified at its inception, and

therefore the first *Terry* prong is not implicated. See *Bunch*, 207 Ill. 2d at 14. However, our inquiry does not end there. We must further consider whether defendant's continued detention after Schmitt realized that defendant was not the owner of the vehicle was reasonable under the second *Terry* prong. This analysis would include the length of the detention and whether Schmitt acted diligently during the stop. See *McQuown*, 407 Ill. App. 3d at 1145. The bystander's report provided a perfunctory version of the circumstances surrounding defendant's continued detention. For example, it neglected to mention that Schmitt asked for defendant's driver's license. This court had to search the record to find the trial court's recitation of the facts to clarify the issue. I am also troubled by the record's failure to indicate whether Schmitt explained to defendant the reason why he initiated the stop.

¶ 14    I further maintain that *People v. Galvez*, 401 Ill. App. 3d 716 (2010), was correctly decided and remains valid law. That case, however, is inapposite to the matter presently before us. In *Galvez*, the arresting officer stopped a vehicle after conducing a random registration check, where the officer learned that one of the two registered owners–one male and one female–had a revoked license. *Id.* at 717. The officer testified that he stopped the car without first pulling alongside the vehicle to determine whether the driver was male or female. We affirmed the trial court's decision to grant the defendant's motion to quash, stating:

> "The presence of a vehicle on the road is not suspicious merely because one of two co-owners is prohibited from driving; it is to be expected that the co-owner whose license is in force would continue to operate the vehicle. *** [T]he stop was based on nothing more than a guess that [the] defendant was a scofflaw and that there was a good chance that he was behind the wheel." *Id.* at 719.

Here, the vehicle had only one registered owner, presenting a different set of circumstances. See *id.* at 720 (noting that whether a *Terry* stop was reasonable must be decided on its own facts).

¶ 15    In sum, I am unwilling to read into the bystander's report that Schmitt's continued detention of defendant was reasonable. Instead, I was required to search the record for facts. In doing so, I discovered that the citation issued to defendant specified that Schmitt observed defendant driving the vehicle at approximately 8:56 p.m. Further, Schmitt's probable cause affidavit specified that defendant was arrested at 9:12 p.m., indicating that the stop lasted approximately 16 minutes. Nonetheless, when a bystander's report is provided in lieu of a transcript pursuant to Illinois Supreme Court Rule 323(c) (eff. Dec. 13, 2005), it should be sufficiently complete to enable a reviewing court to provide meaningful review. See *People v. David*, 96 Ill. App. 3d 419, 422 (1981) ("Completeness [of a bystander's report] is necessary in order that undue emphasis not be placed on isolated matters that may be out of context."). While I am cognizant of the important purpose that bystander's reports serve, this court should not be required to search the record through to ascertain necessary facts for the disposition of an appeal. Toward that end, I encourage the State to take caution to ensure that a bystander's report is sufficiently complete so a reviewing court can provide meaningful review of the issues presented.

¶ 16    JUSTICE BIRKETT, specially concurring.

¶ 17    I agree with my colleagues that the trial court's order granting defendant's motion to quash and suppress was erroneous. I write separately because I believe that it is incumbent upon us to remind the trial court that, when the issue presented in this case was clearly controlled by established Illinois Appellate Court precedent, it was error for the court to rely on a case from our court that was not on point along with an appellate court decision from the State of Washington that was on point but was in conflict with decisions of our appellate court, including this district. I also wish to point out that, in my opinion, the case from this court that the trial court improperly relied upon, *People v. Galvez*, 401 Ill. App. 3d 716 (2010), was wrongly decided. In my view, we should depart from the holding in *Galvez* because it is both badly reasoned and unworkable.

¶ 18    The constant challenge for lawyers is to search for case law that is on point and that supports their argument in the hope that the court agrees. The issue in this case is whether a police officer may request production of a driver's license from the driver of a vehicle that is validly stopped, even though the reasonable suspicion that originally justified the stop has been dispelled. Defense counsel in this case sought to extend the reasoning of this court in *Galvez* to the facts of this case. The issue in *Galvez*, however, had to do with the justification for the stop, not the request for production of a driver's license after a lawful stop. In *Galvez*, a police officer ran a random registration check on the defendant's vehicle and he learned that the vehicle was registered to two owners, one male and one female. The vehicle check revealed that the male's driver's license was revoked. The trial court granted the defendant's motion to suppress, ruling that the officer lacked reasonable suspicion for the stop where he did not first pull forward "to determine whether or not [*sic*] was male or female." *Id.* at 720.

¶ 19    On appeal, this court agreed with the trial court and declined to apply the reasoning in *Village of Lake in the Hills v. Lloyd*, 227 Ill. App. 3d 351 (1992). In *Lloyd*, we held:

> "Police knowledge that *an* owner of a vehicle has a revoked driver's license provides a reasonable suspicion to stop the owner's vehicle for the purpose of ascertaining the status of the license of the driver. Common sense dictates that such information, even alone, is enough to provide a constitutional basis for stopping a vehicle or its occupants." (Emphasis added.) *Id.* at 354.

¶ 20    Instead of applying the reasoning in *Lloyd* and other Illinois Appellate Court decisions also holding that knowledge of a revoked owner provides reasonable suspicion, this court relied upon Professor LaFave's observation:

> "[J]ust as the probable cause determination may sometimes be affected by the officer's failure to acquire and consider other information readily at hand [citation], it would seem that there should likewise be occasions in which the equivocal situation should *not* justify a stop simply because there were rather obvious nonseizure alternatives immediately available for clarifying the matter." (Emphasis in original.) 4 Wayne R. LaFave, Search and Seizure § 9.5(b), at 483 n.73 (4th ed. 2004).

As this court pointed out, Professor LaFave relied upon the dissent in *Thomas v. Dickel*, 213 F.3d 1023 (8th Cir. 2000), to illustrate his point. In *Thomas*, the driver and passenger of a

vehicle stopped for a seat belt violation sued the officers and the city of Des Moines for wrongful arrest. 42 U.S.C. § 1983 (2000). The district court granted summary judgment for the officers and the city. On appeal, the Eighth Circuit affirmed the holding that the officers' stop of the plaintiffs' vehicle was supported by reasonable suspicion where they were behind the vehicle and could not see the shoulder harness. *Thomas*, 213 F.3d at 1025. Judge McMillian's dissent expressed the notion that after an officer observes a suspected seat belt violation from behind a vehicle he "should, at a minimum, be expected to pull alongside the vehicle in question, to look for a shoulder strap extending across the person." *Id.* at 1028 (McMillian, J., dissenting). In *Galvez*, this court accepted Judge McMillian's analysis and extended the reasoning to a vehicle stop where one of two, a male and a female, registered owners, the male, was revoked and the police did not first conduct a visual check of the gender of the driver.

¶ 21        The trial court in this case understood that the facts and issues in *Galvez* were distinct from the facts and issues in this case. It is a fundamental principle that "the precedential scope of a decision is limited to the facts before the court." *People v. Flatt*, 82 Ill. 2d 250, 261 (1980). The trial court ignored this principle. More troubling is the fact that the trial court was aware of a clear line of Illinois Appellate Court precedent that justified both the stop and the request for production of a driver's license. The court cited the decisions in *People v. Barnes*, 152 Ill. App. 3d 1004 (1987), *People v. Bradley*, 292 Ill. App. 3d 208 (1997), *Lloyd*, and *People v. Adams*, 225 Ill. App. 3d 815 (1992). The trial court was bound to follow these case precedents. *People v. Hope*, 184 Ill. 2d 39, 44 (1998). Instead of following these cases and denying the motion, the court relied on a decision from the Court of Appeals of the State of Washington, which held that, where the police stopped a vehicle because the registered owner, a female, was revoked, the officer was not justified in requesting a driver's license from the male driver, absent some other fact that gave rise to a reasonable suspicion of criminal activity. *State v. Penfield*, 22 P.3d 293, 295-96 (Wash. Ct. App. 2001). The *Penfield* decision is clearly at odds with the decisions of the Illinois Appellate Court on this issue. In particular, our court has clearly stated that it is proper to request a driver's license and check the status of the license even though the original purpose of the stop has been resolved. *People v. Safunwa*, 299 Ill. App. 3d 707, 714 (1998). We noted that our decision was "in harmony with a number of other jurisdictions that have held that police may request a driver's license and run a warrant search without probable cause, provided there is an initial valid police-citizen contact." *Id.* The use of foreign decisions as persuasive authority is appropriate only in the absence of Illinois authority on the point of law in question. See *Carroll v. Curry*, 392 Ill. App. 3d 511, 517 (2009). Here, the trial court not only ignored clear Illinois precedent in relying on *Penfield*, but it also speculated that this court would extend the reasoning in *Galvez* to a single-owner vehicle where the owner is revoked but is a different gender than the driver. The court explained in part:

> "Now I'm not unsympathetic that there are questions, I think, in *Galvez* seems to require a prior confirmation of the gender. Clearly it is not always going to be easy to do that. In some factual situations, upon a busy street that's easy to do. Here in Boone County, which has a significant portion of the county is rural, that may be very difficult to do. Be that as it may, it seems that *Galvez* have [*sic*] a requirement of some sort of

confirmation, and at least it seems to on the gender. *Galvez* also doesn't talk about the hypothetical situations if it is the same gender, or somebody who would be older or younger, and I can think of lots of other factual situations that may be problematic for the officer making the stop.

While I'm still not unsympathetic to that, I believe that the line that the appellate court is going to draw, and I hope that they draw, is if there isn't a single registered owner of owner of one gender, and they effectuate the stop, based on *Bradley* and *Barnes*, and they approach, and they see it is another gender, I think at that point the reasonable articulable suspicion has been dispelled, and under *Adams*, they should explain the reason for the stop, and unless they observe some contraband or some odor that allows for additional further investigation, they are going to apologize and advise the defendant that they are free to go.

Therefore, respectfully to the State, the defendant's motion to quash is heard and granted."

¶ 22     The trial court was required to follow the decisions of our court. Its departure in this case, and apparently in another case, was improper. *Galvez* was not on point, which the trial court clearly understood, as evidenced by its statement that it recognized that its ruling was an "extension of *Galvez*" when it denied the State's motion to reconsider. Certainly, the trial court was free to express its view that it disagreed with our holdings that the police may request production of a driver's license even though the justification for the stop no longer exists. However, it should have done so in comment only, not in granting a motion that it was bound by our precedents to deny. See *In re R.C.*, 195 Ill. 2d 291, 297 (2001) ("It is the absolute duty of the circuit court to follow the decisions of the appellate court." (Internal quotation marks omitted.)).

¶ 23     Even in the absence of controlling precedent from our state, when a trial court looks to foreign jurisdictions it should not simply grab onto an opinion from another state with which it agrees. Rather, the court should conduct enough research to determine whether there are majority and minority views and then express its reasoning for adopting the position it takes. It so happens that on the precise issue before this court–whether the police may legally request a driver's license even after the original suspicion evaporates–the clear majority of states answer the question in the affirmative. In *State v. Candelaria*, 2011-NMCA-001, 149 N.M. 125, 245 P.3d 69, the police stopped a vehicle because the registered owner's driver's license was suspended. As the officers approached the vehicle, the officers became aware that the defendant was not the registered owner, yet they asked him to produce his driver's license along with vehicle registration and proof of insurance. *Id.* ¶ 3. The defendant argued that the officers "should have sent him on his way the moment they discovered he was not the registered owner." *Id.* ¶ 17. The court upheld the stop, noting that "an overwhelming majority of jurisdictions hold that police have reasonable suspicion to effect a stop when the registered owner's license is suspended." *Id.* ¶ 13. The court also held that "as long as the original stop is supported by reasonable suspicion, police may legally request such documents even after the original suspicion evaporates." *Id.* ¶ 18. As the court explained, "[s]uch inquiries do not implicate a suspect's Fourth Amendment rights." *Id.*

¶ 24	Also in accord with these principles is a recent opinion from the Supreme Court of Iowa, *State v. Vance*, 790 N.W.2d 775 (Iowa 2010). In *Vance*, a police officer made a traffic stop on a vehicle based upon a license plate computer check that revealed that the registered owner, a female, had a suspended driver's license. As he approached the vehicle, the officer for the first time saw that the driver was male. Nevertheless, the officer requested a driver's license and proof of insurance. The driver did not have a driver's license. Upon running a computer check the officer learned that the driver's license was invalid. The Supreme Court of Iowa upheld the stop and the subsequent arrest. The court noted that "[f]inally, we have reviewed cases from other jurisdictions that have considered this issue, and a majority of those jurisdictions have adopted the standard we approve today." *Id.* at 782.

¶ 25	While the trial courts of our state are bound by our decisions, appellate courts are not bound by these previous decisions. *Schramer v. Tiger Athletic Ass'n*, 351 Ill. App. 3d 1016, 1020 (2004). The Illinois Supreme Court recently reminded us that the doctrine of *stare decisis* ensures that the law will not "merely change erratically, but will develop in a principled and intelligible fashion." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 332 (2011) (quoting *People v. Sharpe*, 216 Ill. 2d 481, 519 (2005), quoting *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81-82 (2004)). In *Manning*, the court stated that any departure from *stare decisis* "must be specially justified; prior decisions should not be overruled absent good cause." *Id.* (citing *Sharpe*, 216 Ill. 2d at 519-20). Good cause to depart from *stare decisis* exists when the governing decision is unworkable or badly reasoned. *Id.* (citing *Sharpe*, 216 Ill. 2d at 519).

¶ 26	In *Galvez*, this court departed from its decision in *Lloyd* as it relates to vehicles that are co-owned but only one driver is suspended or revoked. My colleague, Justice Hutchinson, maintains that *Galvez* "was correctly decided and remains valid law." *Supra* ¶ 14. However, as she explains, "that case *** is inapposite to the matter presently before us." *Supra* ¶ 14. I do not agree that *Galvez* was correctly decided. The court's opinion in *Galvez* was premised upon a false assumption that "most" suspended and revoked drivers generally comply with the law and do not continue to drive during the period when it is illegal for them to drive. The court, in adopting a new standard for vehicles that are co-owned, stated:

	"While some vehicle owners may drive as much after a suspension or revocation as they did before, many if not most will either refrain altogether from driving or at least decrease the time spent behind the wheel. If one of two co-owners of a vehicle reduces his or her driving, the relative likelihood that he or she is the driver–at any particular moment when the vehicle is in operation–also decreases. In addition, if the co-owner whose license has been suspended or revoked drives less, the other co-owner may have the use of the vehicle more often. In that case, the odds will be even longer against finding the owner whose license has been suspended or revoked behind the wheel.

	The presence of a vehicle on the road is not suspicious merely because one of two co-owners is prohibited from driving; it is to be expected that the co-owner whose license is in force would continue to operate the vehicle. Thus, the State's argument essentially turns the 'reasonable suspicion' standard on its head by starting with the assumption that defendant is likely to have committed a criminal act and working backward from that assumption to glean suspicion from otherwise innocuous circumstances. Perhaps the

-9-

starting assumption would be permissible if there were empirical evidence to support it–evidence that, on the whole, drivers with revoked or suspended licenses routinely ignore the restrictions on their driving privileges." *Galvez*, 401 Ill. App. 3d at 719.

Apparently, the State did not support its argument with "empirical evidence." However, there is substantial empirical evidence that flatly refutes the premise upon which the *Galvez* court created this new rule–that in a situation involving co-ownership of a vehicle, a "gender" confirmation is required before reasonable suspicion for a stop exists.

¶ 27 The National Cooperative Highway Research Program Report from 2003 states:

"It is estimated that as many as three-fourths of S/R [suspended/revoked] drivers continue to drive, although they apparently drive less often and more carefully (van Oldenbeek and Coppin, 1965; Hagen et al., 1980; Ross and Gonzales, 1988; DeYoung, 1990). Even so, S/R drivers who continue driving are overrepresented in subsequent violations and crashes.

In at least some regions of the country, drivers who have never held proper license are often illegal aliens who fear detection if licensure is sought. In a California study, this driver group is reported to be even more overrepresented in crashes than drivers with S/R licenses by a factor of 4.9:1 (DeYoung et al., 1997). The threat of detection and deportation [is] believed to be a major reason this group avoids seeking licensure, and often their driving provides transportation for other illegal alien workers (DeYoung, personal communication, 2000). Because of increasing numbers of these workers, as well as the dependence of significant segments of the economy on their labor, this issue is one that cries out [for] innovative solutions." 2 Timothy R. Neuman et al., *A Guide for Addressing Collisions Involving Unlicensed Drivers and Drivers With Suspended or Revoked Licenses*, § III-1 (Nat'l Cooperative Highway Research Program Report 500 (2003)).

¶ 28 A 2005 report of the American Association of State Highway and Transportation Safety Officials states:

"Research indicates that substantial number[s] of drivers continue to drive after their privileges have been suspended or revoked. One of every five fatal crashes involves at least one driver who is not properly licensed (unlicensed, suspended, revoked, expired or canceled). Some 75 percent of drivers with suspended or revoked licenses continue to drive. In addition, a number of people continue to drive even though their cognitive and motor skills have degenerated to levels that make them unfit to operate a motor vehicle. In light of the serious reasons for which driving privileges are revoked or suspended, keeping these drivers off the highway is an important traffic safety objective." 2 Timothy R. Neuman et al., *A Guide for Addressing Collisions Involving Unlicensed Drivers and Drivers With Suspended or Revoked Licenses*, § III-1 (Nat'l Cooperative Highway Research Program Report 500 (2005)).

¶ 29 This "empirical evidence" flatly refutes the conclusion drawn by the court in *Galvez*. The fact is that, unfortunately, suspended and revoked drivers do "routinely ignore the restrictions on their driving privileges." We see the evidence on a daily basis in the courtrooms of our state. State Senator Dan Cronin echoed the frustration created by the scofflaws on the

highways of our state when he sponsored legislation to increase penalties for repeat DWLR/DWLS offenders:

"These are the very serious, most dangerous drivers, who we just are–are so frustrated and all of us have tried very hard here to figure out a way to get them off the roads. They are–they are just driving time bombs just waiting and–to–to wreck havoc and to ruin people's lives. We got to get 'em off the road, these repeat offenders, and the only thing we can do in this bill is to make the penalties more severe and keep 'em locked up." 94th Ill. Gen. Assem., Senate Proceedings, May 11, 2005, at 96 (statements of Senator Cronin).

¶ 30    Based on its premise that most suspended and revoked drivers will obey the law, this court in *Galvez* concluded that "the stop was based on nothing more than a guess that defendant was a scofflaw and that there was a good chance that he was behind the wheel." *Galvez*, 401 Ill. App. 3d at 719. The court's decision was poorly reasoned and should no longer be followed for this reason alone.

¶ 31    Requiring a police officer to pull alongside a vehicle to determine the gender of the driver where the owner is suspended or revoked essentially requires the officer to have more than a reasonable suspicion or even probable cause. He must now have at least the balance of probabilities or a preponderance of the evidence before he can even initiate a traffic stop. It must be remembered that the principal reason for the stop is to resolve any ambiguity as to whether or not criminal activity is afoot. As the United States Supreme Court expressed in *Alabama v. White*, 496 U.S. 325 (1990):

"Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Id.* at 330.

¶ 32    This principle was recently rearticulated by the Illinois Supreme Court in *People v. Close*, 238 Ill. 2d 497 (2010). In *Close*, a police officer ran a license plate check on a vehicle that revealed that the owner's driver's license was revoked. The check also disclosed that the owner possessed a restricted driving permit (RDP), but did not disclose the terms of the RDP. Similar to the argument in *Galvez*, the defendant argued that the officer's knowledge provided only a guess that the defendant was driving outside the terms of his RDP. The court rejected this argument, and stated that the "mere possibility" that the RDP allowed the defendant to drive "does not negate the officer's reasonable suspicion that defendant was driving on a revoked license." *Id.* at 511. Likewise, the mere possibility that a driver of a vehicle is not the revoked owner does not negate reasonable suspicion that the driver is the revoked owner. As the court stated in *Close*, "[p]olice officers are 'not required to rule out all possibility of innocent behavior' before initiating a *Terry* stop." (Internal quotation marks omitted.) *Id.* The court observed that " '[t]he purpose of a *Terry* stop is to allow a police officer to investigate the circumstances that provoke suspicion and either confirm or dispel his suspicions.' " *Id.* at 512 (quoting *People v. Ross*, 317 Ill. App. 3d 26, 31 (2000)).

¶ 33    I also believe that, in addition to being poorly reasoned, the *Galvez* gender check

-11-

requirement is simply unworkable in the real world. Common sense tells us that a large percentage of vehicles are co-owned, often by husbands and wives, for example. Additionally, even in the best of circumstances it is often difficult to visually determine the gender of a driver even when the other vehicle is in close proximity.

¶ 34    In *Vance*, 790 N.W.2d at 781, the Supreme Court of Iowa also declined to adopt a rule that would require police officers to "obtain information indicating the driver of the vehicle is the registered owner before reasonable suspicion for an investigatory stop arises." The court held that "an officer has reasonable suspicion for an investigatory stop of a vehicle to investigate whether the driver has a valid driver's license when the officer knows the registered owner of the vehicle has a suspended license, and the officer is unaware of any evidence or circumstances indicating the registered owner is not the driver of the vehicle." *Id.*

¶ 35    The court discussed three reasons for its decision. First, citing cases from a number of jurisdictions, the court noted that it is a reasonable inference that the driver is the owner of the vehicle. Second, "to forbid the police from relying on such an inference to form reasonable suspicion for an investigatory stop would seriously limit an officer's ability to investigate suspension violations because there are few, if any, additional steps an officer can utilize to establish the driver of a vehicle is its registered owner." *Id.* at 782 (citing *Barnes*, 152 Ill. App. 3d 1004). Third, "allowing a stopping officer to infer the registered owner is the driver, absent any evidence to the contrary, ensures the safety of the roadways and of law enforcement." *Id.*

¶ 36    In *Vance*, like *Galvez*, the officer did not observe the sex or the identity of the driver until after the stop. The officer made contact with the driver and asked for a driver's license and proof of insurance. The defendant, who did not have a driver's license, handed the officer an Iowa nondriver's identification card. The defendant did not know if there was an insurance card in the vehicle. The officer returned to his patrol car and learned that the defendant's "license status was barred." *Id.* at 778. Subsequent inquiries led to the discovery of evidence that was used to prosecute him for "possession of precursor products with the intent to manufacture methamphetamine." *Id.* at 777. He was convicted of both the possession charge and driving while license barred.

¶ 37    In *Vance*, defense counsel did not raise the issue of whether the stop continued to be reasonable and valid once the officer realized that the driver was not the registered owner. The Supreme Court of Iowa discussed the issue in a footnote. *Id.* at 783 n.1. As the *Vance* court noted, "[a] number of jurisdictions have invalidated the further detention or investigation of a suspect after the initial purpose of an investigatory stop has been resolved." *Id.* This is a minority view and one that has been specifically rejected by our court. In *Safunwa*, 299 Ill. App. 3d 707, this court unequivocally stated that it is proper to detain a driver long enough to confirm his or her status even though the original purpose of the stop has been resolved. This court quoted the trial court in its opinion:

    " '[A]fter a valid contact between police and a citizen[,] a request for a drivers license and check on the license is allowable so long as it is of a momentary intrusion and of limited duration. Here the evidence shows that the detention and intrusion [were] quite

minimal–some sixty to ninety seconds. The public interest in allowing the license check outweighs the minimal intrusion on the defendant[;] for this reason his motion is denied.' " *Id.* at 710.

This court noted that "several Illinois courts have utilized section 6-112 of the Code to permit police to request production of a driver's license even in instances where there has been no initial suspicion of a traffic violation or other criminal activity." *Id.* at 713 (citing *People v. McKnight*, 198 Ill. App. 3d 530, 533 (1990), and *People v. Francis*, 4 Ill. App. 3d 65, 67 (1971)). This court acknowledged that, while it is proper to drive on a "traffic citation, we nonetheless find that, given the context of the initial stop, the officers had a sufficient justification in detaining the defendant long enough to confirm the validity of the defendant's license." *Id.* This court noted that this view "is in harmony with a number of other jurisdictions that have held that police may request and run a warrant search without probable cause, provided there is an initial valid police-citizen contact." *Id.* at 714.

¶ 38    Drivers who are stopped by police fully expect that their driver's license status will be checked and that they will be asked to show proof of registration and insurance because the law requires them to do so. 625 ILCS 5/6-112 (West 2010) (license or permit must be in possession of the driver and displayed on demand); 625 ILCS 5/3-707(b) (West 2010) (proof of insurance must be displayed upon request); 625 ILCS 5/3-701 (West 2010) (proof of registration). Indeed, our court recently upheld a request for a driver's license from a driver where the police had no reasonable suspicion of criminal activity, but were instead involved in a "community caretaking function." *People v. Mains*, 2012 IL App (2d) 110262, ¶ 12. A request for a driver's license from a validly stopped driver is official police conduct that does not compromise any legitimate interest in privacy and is therefore not a search subject to the fourth amendment. See *People v. Driggers*, 222 Ill. 2d 65, 72 (2006). As our court held in *People v. Townsel*, 123 Ill. App. 2d 280 (1970), a request for a driver's license or proof of ownership does not constitute a search. "A search implies a prying into hidden places for that which is not open to view." *Id.* at 284.

¶ 39    For the reasons I have stated, I concur with my colleagues that the trial court's suppression order was erroneous, but I would go further and depart from the holding in *Galvez*, a wrongfully decided case upon which the trial court improperly relied.